**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 96-10310**
_____


**PETROSURANCE CASUALTY COMPANY,**
**doing business as Legion Casualty Co.,**

**Plaintiff-Appellant,**

**versus**

**THREADNEEDLE INSURANCE CO., LTD.; J. BESSO &**
**COMPANY LIMITED; BESSO BLOODSTOCK LTD.,**

**Defendants-Appellees.**

_____

**Appeal from the United States District Court**
**for the Northern District of Texas**
**(4:92-CV-381-Y)**
_____
September 29, 1997

Before DUHÉ and BARKSDALE, Circuit Judges, and COBB, District
Judge.[1]

PER CURIAM:[2]

The starting point for the challenged judgment as a matter of

law in favor of Threadneedle Insurance Co., Ltd. (TICL), and J.

Besso & Company Limited and Besso Bloodstock Ltd. (collectively,

Besso) is whether, in this diversity action, Petrosurance Casualty

---

[1]    District Judge of the Eastern District of Texas, sitting
by designation.

[2]    Pursuant to 5TH CIR. R. 47.5, the Court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

Company's (PCC) claims for conversion, civil theft, tortious interference with contract, conspiracy, and breach of fiduciary duty are barred by Texas' two-year statute of limitations. Agreeing with the district court that the claims are time-barred, we **AFFIRM**.

## I.

PCC was acquired by the Oil and Gas Insurance Company (OGICO) in August 1988. OGICO was then owned by The Forum Group (The Group). PCC began writing equine mortality insurance in Texas and Oklahoma in 1989, and OGICO employed Lahrye Radford to oversee this new program. The Group's equine line of business was reinsured by various insurers in the London insurance market. Stephen Fryett, who was the director of equine insurance for Besso Bloodstock, acted as the reinsurance intermediary for this aspect of OGICO's business.

In late 1988, Terry Albracht and W. B. Jones formed Albracht Jones Bloodstock Underwriters (AJBU), an insurance brokerage in San Antonio, Texas. AJBU entered into an agency agreement with The Group effective 1 January 1989, and began placing equine mortality risks with PCC. The agreement provided that premiums for PCC policies sold by AJBU were to be collected by AJBU, but remained PCC's property, and that such premiums were held by AJBU in trust and as fiduciary for PCC. Pursuant to a contract dated 13 December 1989, PCC reinsured equine risks through Besso.

Beginning in the latter part of 1989, AJBU became dissatisfied with its commission rate, and the relationship between AJBU and PCC began to deteriorate. There was evidence that AJBU experienced problems obtaining credits from PCC for canceled policies; that clients complained to AJBU about PCC's slow payment of claims; and that some PCC claims checks were not honored due to insufficient funds. (PCC eventually paid those checks.)

In October 1989, AJBU employed a new insurance agent whose clientele owned horses that did not fit PCC's underwriting criteria; accordingly, in January 1990, AJBU entered into a contract with TICL which granted AJBU authority to bind TICL on equine risks. Besso acted as the intermediary through which AJBU placed insurance with TICL.

Effective 6 April 1990, Radford resigned from his employment with OGICO. As a result, The Group advised AJBU by 2 April 1990 letter that The Group would be unable to continue writing equine business and, therefore, AJBU's agency agreement would be terminated effective 7 July 1990.

Pursuant to Albracht's request, Arnold Cullivan, Underwriting/Marketing Manager for The Group, met with Albracht and his partner, Jones, on 12 April. Albracht testified at trial that he discussed with Cullivan the possibility that AJBU would have to move the business that had been placed with PCC; and that Cullivan was very receptive. By 13 April letter, Cullivan summarized the meeting, and stated that The Group's senior management would

discuss in the near future the possibility of the continuation of the equine program.

Albracht responded by 16 April letter that he "hope[d] the senior management will reconsider this entire situation so we will not have to rewrite this book of business as we discussed". Enclosed with that letter was a check for approximately $73,000, as "partial payment [of premiums] agreed upon until the terms and conditions of our meeting and conversations have been resolved".

But in the meantime, also on 16 April, and unbeknownst to AJBU, the Insurance Commissioner of Oklahoma suspended PCC's certificate of authority to transact business. PCC was found to be "in such condition as to render its further transaction of insurance in Oklahoma hazardous to its policyholders and to the people of Oklahoma".

By 8 May letter to AJBU, PCC *terminated* the agency agreement *effective 10 May*, "due to *non payment* of premiums". (Emphasis added.) AJBU responded by 10 May letter:

> We have received your letter dated May 8, 1990 and due to the way we have been treated in the past year with false hopes and deception *we are moving this book of business*.
>
> Take note that *this will create a credit balance on our statement* for all companies. We will be sending you the cancellation evidence in the very near future and will *expect the refunds* to be made to us immediately.

(Emphasis added.) PCC did not respond.

- 4 -

On 17 May, the Ohio Department of Insurance notified AJBU that a rehabilitator had been appointed for PCC's parent company, OGICO, and that AJBU should "take the necessary steps to protect your clients' interests by obtaining insurance coverage with a different insurance company on all new business effective after May 15, 1990". And the next day, 18 May, an Oklahoma court issued a temporary restraining order enjoining PCC from further transaction of business. Albracht testified at trial that AJBU learned of the Oklahoma proceedings only after a client requested that his equine insurance be moved immediately; thereafter, other clients demanded that AJBU do likewise.

Albracht spoke with Fryett, Besso's managing director, about moving the equine insurance to the London market. On 25 May, AJBU asked Besso to move/place insurance for its PCC insureds to/with TICL immediately (the rollover). And, on 29 May, AJBU received a fax from Besso confirming TICL's agreement to accept the rollover business effective 25 May. Also on 29 May, AJBU notified its policyholders that it was no longer representing OGICO and its affiliate companies (to include PCC), and that it would "be changing your policy effective May 25, 1990 unless we hear from you". Albracht testified that none of the insureds notified AJBU that they wanted their insurance to remain with PCC.

Albracht testified also that the TICL policy premiums resulting from the rollover were paid with unearned premiums which belonged to the insureds as a result of the cancellation of their

PCC policies. Along this line, PCC took the position that its policies had not been canceled properly, but that, even assuming they were canceled effective 25 May 1990, AJBU would still owe PCC approximately $225,000 for earned premiums.

Albracht testified further that, after the rollover, he paid more than $1.2 million in claims on behalf of TICL. There was also testimony that, after PCC's rehabilitation, discussed *infra*, PCC paid claims in excess of $100,000 on policies written by AJBU; but, PCC's witness (Lovelace) did not know whether those claims related to incidents that occurred before or after 25 May (effective date of the rollover).

By 4 June letter to Cullivan at The Group, AJBU stated that it had replaced the book of business as outlined in its 10 May letter, and that cancellation documents were enclosed. Albracht testified that PCC did not respond to this 4 June letter.

Also on 4 June, PCC was declared insolvent by the Oklahoma court, and a receiver was appointed. Approximately a month later, on 5 July, the Oklahoma court ordered PCC to liquidate. And, on 23 July, a Texas court entered a temporary restraining order against PCC and appointed a temporary receiver. That August, following rehabilitation, PCC was purchased from OGICO by Petro Insurers General Agency (owner at time of trial in 1996).

In the Fall of 1990, in a previously filed action in Bexar County, Texas, AJBU added PCC as an additional defendant, seeking

to enjoin it from canceling equine mortality policies. PCC counterclaimed against AJBU, Albracht, and Jones (AJBU's other partner) to recover unpaid premiums. On that counterclaim, PCC obtained a default judgment against AJBU and Albracht for $403,000, and later against Jones for the same amount, plus attorney's fees and expenses of approximately $330,000.

PCC filed this action on 26 May 1992, alleging that Besso and TICL entered into a scheme with AJBU, wherein AJBU purportedly canceled all PCC policies and replaced the insurance with TICL through Besso; that PCC's new owner later became aware that the policies had not, in fact, been canceled, thus exposing PCC to the risk of payment of claims on such policies; and that PCC's new management acted in reliance on AJBU's representations that no net premiums were due from AJBU to PCC and that the policies had been canceled and rolled over.

In its May 1994 amended complaint, PCC alleged, *inter alia*, that, *in September and October 1989*, AJBU, with Besso and TICL's knowledge, began withholding net premiums due PCC; that, *by October 1989*, AJBU placed policies with TICL and Besso, which policies should have been placed with PCC; and that Besso and TICL conspired with AJBU to wrongfully deprive PCC of net premiums held in trust by AJBU for PCC. PCC claimed fraud, breach of the duty of good faith and fair dealing, conversion, civil theft, tortious

interference with contract, conspiracy, and breach of fiduciary duty.

In September 1995, the district court granted summary judgment for TICL and Besso on PCC's claims for fraud and for breach of the duty of good faith and fair dealing (PCC does not appeal that ruling), but not as to PCC's remaining claims. However, after PCC rested at the jury trial in early 1996, the court granted TICL and Besso's motions for judgment as a matter of law on each of PCC's remaining claims, as well as on their statute of limitations defense.

## II.

A Rule 50 judgment as a matter of law is reviewed under the familiar standard set forth in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc):

> [We] consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motion[], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion[] should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motion[]

> ... should not be decided by which side has the better of the case, nor should [it] be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing*, 411 F.2d at 374-75. See FED. R. CIV. P. 50; *e.g., Bellows v. Amoco Oil Co.*, 118 F.3d 268, 273 (5th Cir. 1997); *Conkling v. Turner*, 18 F.3d 1285, 1300-01 (5th Cir. 1994). Because this is a diversity action, Texas substantive law applies. *E.g., Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1145 (5th Cir. 1997).

For starters, it is well to remember that this action is *not* against AJBU; it is only against TICL and Besso, neither of whom was a party to the agency agreement between PCC and AJBU. PCC contends that the district court erred by granting judgment as a matter of law on its claims for conversion, civil theft, tortious interference with contract, conspiracy, and breach of fiduciary duty. (As noted, it has not appealed the adverse ruling on its claims for fraud and for breach of the duty of good faith and fair dealing.) In support, PCC asserts that it presented sufficient evidence that TICL and Besso knowingly participated in the wrongful rollover of PCC's business and wrongful transfer to Besso and TICL of insurance premiums *owed to PCC by AJBU and held in trust for PCC by AJBU*; and that the district court erred by excluding evidence

- 9 -

that TICL and Besso violated Texas surplus lines statutes and by excluding evidence of concealment and an ongoing conspiracy. PCC contends also that the limitations ruling is erroneous because PCC *did not suffer injury* until at least 29 May 1990 (the actual date of the rollover), and *did not learn of TICL and Besso's participation in that rollover* until March 1992, during discovery in the Bexar County action — both events being less than two years before it filed this action on 26 May 1992. Because we conclude that PCC's claims are time-barred, we do not address its remaining contentions.[3]

A.

It is undisputed that each of PCC's claims in issue is subject to a two-year statute of limitations. *See* **Autry v. Dearman**, 933 S.W.2d 182, 190 (Tex. App.—Houston 1996, writ denied) (conversion); **Kansa Reinsurance Co., Ltd. v. Congressional Mortgage Corp.**, 20 F.3d 1362, 1369 (5th Cir. 1994) (breach of fiduciary duty); **LaPorte Constr. Co., Inc. v. Bayshore Nat'l Bank**, 805 F.2d 1254, 1256 (5th Cir. 1986) (conversion, theft); **Stroud v. VBFSB Holding Corp.**, 917 S.W.2d 75, 82 (Tex. App.—San Antonio 1996, writ denied) (civil

---

[3] In the briefs and at oral argument, more than considerable attention was devoted to whether Albracht's affidavit was admitted as substantive evidence or only for impeachment. Because PCC does not rely on Albracht's affidavit in support of its statute of limitations contentions, we need not address that dispute either.

conspiracy, tortious interference with contract). As stated, PCC filed this action on 26 May 1992.

Under Texas law, the general rule is that a claim "accrues when a wrongful act causes some legal injury, *even if* the fact of injury is not discovered until later, and *even if* all resulting damages have not yet occurred". *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996) (emphasis added). Of course, a primary purpose of statutes of limitations is to compel the assertion of claims within a reasonable period while the evidence is available (not lost) and fresh in the minds of the parties and witnesses. *E.g., id.* at 3; *Computer Associates Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996). When a defendant asserts that a claim is time-barred, *see* FED. R. CIV. P. 8(c), it must conclusively prove all essential elements of that affirmative defense. *Townewest Homeowners Ass'n, Inc. v. Warner Communication, Inc.*, 826 S.W.2d 638, 639 (Tex. App.—Houston 1992, no writ).

PCC contends that Besso and TICL failed to prove when PCC's claims accrued. It maintains that it was not legally injured until AJBU canceled PCC's policies and began diverting PCC's trust funds to Besso and TICL. Therefore, it asserts that the earliest date that its claims might have accrued is 29 May 1990, when Besso's Fryett notified AJBU that TICL would accept the equine risks and AJBU began canceling the PCC policies. Accordingly, PCC asserts

that its action was timely filed on 26 May 1992, just within two years of the date of cancellation.

For the accrual of the limitations period, TICL and Besso rely in part on the 10 May 1990 letter from AJBU's Albracht to PCC, which stated that "we are moving this book of business". PCC posits that the 10 May letter is "a mere threat to take further action" and is therefore insufficient to trigger such accrual.

The letter is not a mere threat. It does not state that AJBU *will move* the business in the future unless some contingency is satisfied; instead, it states that "we *are moving* this book of business" and that the cancellation will create a credit balance. (Emphasis added.) To the extent that PCC claims to have been injured by the cancellation of its policies, it was made aware, upon receipt of the 10 May letter, that injury had occurred, or, at the very least, was imminent. Moreover, it was put on notice that AJBU took the position that the cancellation would result in PCC owing AJBU money.

PCC maintains, however, that it had no knowledge of a *conspiracy* when AJBU fell behind in its payments to PCC; that it did not know, at the time it received its last payment from AJBU in April 1990, that it would not receive further payments; and that it fully expected to be paid by AJBU (TICL and Besso's alleged co-conspirator), even after the rollover occurred. Again, PCC insists

- 12 -

that the earliest it was injured was on 29 May, when AJBU began canceling policies.

PCC's contention is contradicted by the testimony of its designated corporate representative, Lovelace. He testified that, by the time AJBU made its last payment to PCC on 12 April 1990, AJBU owed PCC between $200,000 to $300,000; that it was PCC's position that TICL and Besso interfered with PCC's agency agreement with AJBU *prior* to PCC's cancellation of that agreement on 10 May; and that it was PCC's position that, *prior* to 25 May 1990, TICL and Besso *conspired* with AJBU to commit wrongful acts to take PCC's premium money:

> Q.   ... You're claiming in this case ... that [PCC was] damaged as a result of [TICL's] interfering with [PCC's] contract with [AJBU], and that [TICL] somehow conspired with [AJBU] and committed theft.  Is that a fair summary?
>
> A.   That's fair.
>
> Q.   Now, ... all this circles around the contract ... between [AJBU] and [PCC], the breach of that contract?
>
> ....
>
> A.   ... I suppose so ....
>
> Q.   ... Now, effective May 10, 1990, that contract was canceled by Arnold Cullivan for [PCC]; is that correct? ....
>
> A.   Okay.  That's what it says --
>
> ....

- 13 -

Q.   Is it [PCC's] position that [TICL] and Besso interfered with this contract prior to its being canceled by [PCC]?

....

A.   Yes, I think they interfered with it. Like I say --

Q.   ... [I]s it [PCC's] position that the wrongful acts in this case then occurred before the cancellation of the contract, which is the center of this case?

A.   I'm not sure when it occurred, sir.  I don't know.

Q.   Do you think that if there is a conspiracy, it had to have occurred prior to the rollover, correct?

A.   You're asking me what I think, okay?  And I think that the rollover never occurred.

Q.   Okay.   Well, let's assume that the rollover is alleged to have occurred on May 25?

A.   Okay.

Q.   *Is it [PCC's] position that prior to May 25th, [TICL] and Besso conspired with [AJBU] to commit wrongful acts to deprive [PCC], to take [PCC's] premium money.*

....

A.   *Yes, I think they did.*

(Emphasis added.)

According to Lovelace's testimony, the conspiracy that allegedly caused PCC's damages occurred more than two years prior to PCC's filing this action on 26 May 1992.  This is consistent with the allegations in PCC's amended complaint that the alleged

wrongful acts by TICL and Besso occurred more than two years before this action was filed. For example, PCC alleged that, in September or October 1989, AJBU, with the knowledge, assistance, and aid of Besso, whose knowledge is imputed to TICL, began withholding net premiums due PCC.

PCC cites *Williams v. Upjohn Co.*, 153 F.R.D. 110, 113 (S.D. Tex. 1994), and *Alfaro v. Dow Chemical*, 751 S.W.2d 208, 209 (Tex. App.—Houston 1988), *aff'd*, 786 S.W.2d 674 (Tex. 1990), *cert. denied*, 498 U.S. 1024 (1991), for the proposition that a claim accrues when the plaintiff is in possession of the critical facts that he has been hurt *and who has inflicted the injury*. Neither *Williams* nor *Alfaro* supports PCC's contention that the limitations period does not commence until the plaintiff learns the identity of the parties responsible for the injury. As discussed *supra*, the limitations period commences when the wrongful act effects an injury, *S.V.*, 933 S.W.2d at 4; *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990), not when the alleged wrongdoers are identified. *Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 344 n.3 (Tex. 1992); *see also Bayou Bend Towers Council of Co-Owners v. Manhattan Constr. Co.*, 866 S.W.2d 740, 743 (Tex. App.—Houston 1993, writ denied) (identification of "specific parties responsible" not required for commencement of limitations period); *Harrison County Finance Corp. v. KPMG Peat Marwick, LLP*, 948 S.W.2d 941, 947 (Tex. App.—Texarkana 1997) (same).

In its reply brief, apparently in response to TICL's contention that the hereinafter described discovery rule is inapplicable, PCC asserts for the first time that, alternatively, even if Besso and TICL proved accrual prior to 26 May 1990, the discovery rule tolls the limitations period. It goes without saying that, generally, we do not address points raised for the first time in a reply brief. But, because PCC is responding to TICL, we will address this contention. Obviously, PCC should have presented it in its opening brief, especially since it ties in with PCC's claim that it did not become aware of TICL and Besso's wrongful acts until 1992. Restated, PCC asserts that the limitations period did not start running until 1992, when, during the Bexar County action, it became aware of the claimed conspiracy between AJBU, Besso, and TICL, which was the cause of its continued tensions with AJBU.

Under Texas law, the discovery rule is a "narrow exception" to the earlier discussed general rule that a claim accrues when a wrongful act causes some legal injury. *S.V.*, 933 S.W.2d at 4, 23. The exception defers accrual of a claim until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the claim. *Altai*, 918 S.W.2d at 455. The Texas Supreme Court has been "cautious in its extension of the discovery rule and hesitant to adopt it absent compelling reasons to show

that a whole class of cases is being unjustly served by the general rule of accrual." ***Diesel Fuel Injection Service, Inc. v. Gabourel***, 893 S.W.2d 610, 613 (Tex. App.—Corpus Christi 1994, no writ). Generally, application of the discovery rule exception has been permitted in those cases where the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable. ***Altai***, 918 S.W.2d at 456.

Needless to say, to be "inherently undiscoverable", an injury need not be absolutely impossible to discover; otherwise, suit would never be filed and the question whether to apply the discovery rule would never arise. ***S.V.,*** 933 S.W.2d at 7. Nor does it mean merely that a particular plaintiff did not discover his injury within the limitations period; discovery of a particular injury is dependent not solely on the nature of the injury but on the circumstances in which it occurred and plaintiff's diligence as well. ***Id***. "An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence." ***Id***.

TICL contends that the discovery rule does not apply because PCC failed to both *plead and prove* its elements, as required by Texas law. *See **Autry v. Dearman***, 933 S.W.2d at 192. But, it goes without saying that, although Texas law supplies the statute of limitations for this diversity action, federal law governs the pleading requirements. *E.g., **Colonial Penn Ins. Co. v. Market**

*Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1993). In other words, although the discovery rule must be specifically pleaded in Texas state court, it need not be specifically pleaded in federal court. *Id*. Under FED. R. CIV. P. 8, PCC was required to plead sufficient facts to put TICL and Besso on notice of the theories on which the complaint is based. *Colonial Penn Ins. Co*., 1 F.3d at 376.

In any event, we need not decide whether the discovery rule was properly pled or otherwise preserved, because we conclude that the wrongful acts complained of by PCC are not "inherently undiscoverable". *See* **Sunwest Bank of El Paso v. Basil Smith Engineering Co., Inc.**, 939 S.W.2d 671, 674 (Tex. App.—El Paso 1996, writ denied) (open and blatant acts of theft which caused alleged injury not so difficult to discern that injury was inherently undiscoverable). Accordingly, the discovery rule is not applicable.

For example, Lovelace testified that it was apparent from PCC's books and records that AJBU owed premium payments to PCC, and that the discovery of that shortage required no particular expertise, but was simply a matter of mathematical calculation. And, the correspondence between PCC's Cullivan and Albracht reveals that there were disputes in April 1990 between AJBU and PCC about amounts owed. In that regard, as noted, PCC terminated AJBU's agency agreement, effective 10 May 1990, *for nonpayment of*

*premiums*.  Moreover, as stated, PCC's claimed lack of awareness of the involvement of Besso and TICL in causing its alleged injuries is irrelevant, because the limitations period begins to run when the wrongful act causes an injury, not when the alleged wrongdoers are identified.  See ***Murray***, 800 S.W.2d at 828; ***Russell***, 841 S.W.2d at 344 n.3; ***Bayou Bend***, 866 S.W.2d at 743.

PCC's apparent attempt to use the discovery rule to postpone accrual until its new owner learned of the alleged wrongdoing is also misplaced.  That the new owner may have learned of the alleged wrongdoing less than two years prior to filing suit is irrelevant, because Cullivan's knowledge is imputed to PCC and its new owner. *See **Alice Roofing & Sheet Metal Works, Inc. v. Halleman***, 775 S.W.2d 869, 870 (Tex. App.—San Antonio 1989, no writ)(later-acquired knowledge by new and subsequent corporate shareholders and officers does not constitute new knowledge to the corporate entity within the meaning of the discovery rule and cannot be used to defeat a statute of limitations defense); ***Bayou Bend***, 866 S.W.2d at 742-45 (same).

## III.

For the foregoing reasons, the judgment is

***AFFIRMED***.

- 19 -